No. 26-1037, 26-1038, 26-1039, 26-1043, 26-1051

_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA

_____

WASHINGTON STATE, KING COUNTY, et al.,
*Petitioners,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondent.*

_____

ON PETITION FOR REVIEW OF AN ACTION OF THE
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

_____

## AMICUS CURIAE JOHN WORTHINGTON

_____

**John Worthington**
**303 S. 5TH Ave. G-53**
**Sequim WA. 98382**

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Amicus Curiae John Worthington hereby certifies as follows: (A) Parties and Amici

Petitioners: American Public Health Association; American Lung Association; Sierra Club; Environmental Defense Fund; State of Washington; King County; and various state and local government coalitions.

Respondents: U.S. Environmental Protection Agency; and Michael S. Regan, Administrator.

Amici: John Worthington (Amicus in Opposition).

(B) Rulings Under Review

(C) Related Cases

Amicus is aware of other related cases pending in this Court or any other court that meet the definition of "related cases" under Local Rule 28(a)(1)(C). No. 26-1037, 26-1038, 26-1039, 26-1043, 26-1051.

Dated: March 24, 2026

Respectfully submitted,

/s/ John Worthington
John Worthington, Pro Se

i

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, amicus curiae **John Worthington** makes the following disclosure: Amicus curiae John Worthington is an individual. He is not a corporation, and as such, there is no parent corporation or any publicly held corporation that owns 10% or more of any stock in an entity associated with this filing.

Dated: March 24, 2026

Respectfully submitted,

*/s/ John Worthington*

John Worthington, *Pro Se*

## CERTIFICATE REGARDING AUTHORITY TO FILE

Pursuant to Fed. R. App. P. 29(a)(2) and D.C. Circuit Rule 29(b), Amicus Curiae John Worthington states that he has consulted with the Respondent EPA has consented to the filing of this brief. Petitioners have not consented. Accordingly, Amicus is filing a concurrent Motion for Leave to File Amicus Curiae Brief.

Pursuant to D.C. Circuit Rule 29(d), Amicus Curiae certifies that he is not aware of any other non-government amicus brief addressing the specific subject of this brief—namely, the self-inflicted nature of Petitioners' injuries resulting from third-party NGO contractor actions, international ICLEI methodologies, and the statutory "residential-only" opt-outs under RCW 36.70A.070(7). As a resident of the Strait of Juan de Fuca directly impacted by the "Strait Funnel" effect and the resulting emissions asymmetry, Amicus is uniquely suited to provide the Court with a resident's perspective and specific evidentiary exhibits regarding international maritime bunker fuel and federal grant leveraging that will assist the Court in resolving this case.

Dated: March 24, 2026

Respectfully submitted,

*/s/ John Worthington*
John Worthington, *Pro Se*

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS
AND RELATED CASES . . . . ...................................…............i

CERTIFICATE REGARDING AUTHORITY TO FILE……………………....ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . .....vi

GLOSSARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ... . . ..… vii

INTERESTS OF AMICI CURIAE . . . . . . . . . . . . . . . . . . . .... . ...... . .1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . .........2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . .... . ...... . 2

PROCEEDINGS BELOW. . . . . . . . . . . . . . . . . . . . . .... . . ....... .3

SUMMARY OF ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . .... . . ..... 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . ........................5

    I.    PETITIONERS LACK ARTICLE III STANDING BECAUSE
        THEIR ALLEGED INJURIES ARE "SELF-INFLICTED" BY
        THIRD PARTIES………………………………………….………5

    II.    THE STATE AND LOCAL COALITION PETITIONERS'
        "HARM" IS A SELF-INFLICTED RESULT OF STATUTORY
        CHOICE AND CONTRACTUAL LEVERAGING BY THIRD
        PARTIES……………………………………………….........5

    III.    INTERNATIONAL CONTRACTUAL GOVERNANCE
        CREATED NECESSARY THIRD PARTY [EXHIBIT E
        ADD. 19 ]……………………………………………………...8

IV. PLANNED AGRICULTURAL FAILURE AND THE 72% GAP [EXHIBITS G ADD. 69 & A ADD. 2]…………………………………9

V. THE "STRAIT FUNNEL" EFFECT [EXHIBITS F ADD. 65, G ADD. 69, & H ADD. 80]………………………………..…..9

VI. THE BUNKER FUEL AND AIR CARGO DIVERGENCE [EXHIBITS B ADD. 6, C ADD. 10, & D ADD. 16]……………..……..9

VII. PETITIONERS LACK LIKELIHOOD OF SUCCESS ON THE MERITS……………………………………………...10

A. ABSENCE OF PROXIMATE CAUSATION UNDER SEVEN COUNTY INFRASTRUCTURE COALITION V. EAGLE COUNTY (2025)………………………………………10

B. CORRECTION OF PERVERSE INCENTIVES…………..………….…...10

CONCLUSION……………………………………………..……….10

CERTIFICATE OF COMPLIANCE …………………………………………… 12

CERTIFICATE OF SERVICE ……………………………………………….. 13

# TABLE OF AUTHORITIES

## CASES

*Brotherhood of Locomotive Eng'rs & Trainmen v. FRA*, 972 F.3d 83 (D.C. Cir. 2020) ...................................................... 6

*Cascade Bicycle Club v. Puget Sound Reg'l Council*, 175 Wn. App. 494, 306 P.3d 1031 (2013) ......................................... 3, 5, 8

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................... 6

*Seven County Infrastructure Coalition v. Eagle County, Colorado*, 145 S. Ct. 1497 (2025) ........................................................ 10

## STATUTES (RESIDENTIAL-ONLY OPT-OUTS)

Arizona (A.R.S. § 9-461.05) ........................................................ 7

California (Cal. Gov. Code § 65852.24) ....................................... 7

Colorado (C.R.S. § 31-23-301) ................................................... 7

Delaware (22 Del. C. § 301) ....................................................... 7

District of Columbia (D.C. Code § 6-641.01), ............................... 7

Hawaii (HRS § 205-2) ............................................................... 7

Illinois (65 ILCS 5/11-13-1) ....................................................... 7

Maine (30-A M.R.S. § 4326(3)) ................................................... 7

Maryland (Md. Code, Land Use § 3-102) ..................................... 7

Massachusetts (M.G.L. c. 40A § 3A) ........................................... 7

Michigan (MCL 125.3506) .......................................................... 7

Minnesota (Minn. Stat. § 462.12) ............................................... 7

Nevada (NRS 278.250) ............................................................... 7

New Jersey (N.J.S.A. 40:55D-62) ................................................ 7

New Mexico (NMSA 1978, § 3-21-1)……………………………..…..……….7

New York (NY Gen. City Law § 20(24)……………………….…………...…7

North Carolina (N.C.G.S. § 160D-501)…………………….…..…………7

Ohio (ORC § 519.02 and § 713.10)……………………………...….……..7

Oregon (OAR 660-004-0040 and ORS 227.090)………………....………..7

Pennsylvania (53 P.S. § 10603)………………………………………..……7

Rhode Island (R.I. Gen. Laws § 45-24-37 and § 45-22.2-6)………….……....7

Texas (Tex. Local Gov't Code § 211.003)……………………………….……7

U.S. Virgin Islands (V.I. Code tit. 29, § 226)………………….….…..…….7

Vermont (24 V.S.A. § 4411, § 4348a, and § 4302)………………..…………...7

Virginia (Va. Code § 15.2-2280)………………………..………...…..7

Washington (RCW 36.70A.070(7)……………………………...4, 6, 7, 9, 10, 11

Wisconsin (Wis. Stat. § 62.23(7) and § 66.1001(2)(h)……………………….7

## RULES & REGULATIONS

Fed. R. App. P. 29 ................................................................. iii

EPA Form 4700-4 (Civil Rights Compliance/Grant Leveraging) ......................... 8

D.C. Circuit Rule 28(a)(1)…………………………………………………….i

Fed. R. App. P. 29(a)(2)………………………………………...…iii

# GLOSSARY OF ABBREVIATIONS

**APA** .................... Administrative Procedure Act

**CAA** .................... Clean Air Act

**DOJ** .................... Department of Justice

**EPA** .................... Environmental Protection Agency

**FRAP** .................. Federal Rules of Appellate Procedure

**ICLEI** ................. International Council for Local Environmental Initiatives

**NGO** ................... Non-Governmental Organization

**NODC** ................. National Oceanographic Data Center

**NOx** .................... Nitrogen Oxides

**PM2.5** ................. Particulate Matter (2.5 micrometers or smaller)

**RCW** ................... Revised Code of Washington

## INTEREST OF AMICUS CURIAE

Amicus curiae John Worthington is a resident of Sequim, Clallam County, Washington, situated in the geographic "rain shadow" of the Strait of Juan de Fuca. Amicus has a profound interest in ensuring that federal agencies and state sovereigns remain tethered to their specific statutory "wheelhouses" and do not use administrative findings as "regulatory levers", for third-party contractors to facilitate de-industrialization. As a resident directly exposed to transboundary air pollution—including PM2.5 and NOx from international maritime bunker fuel—Amicus provides a unique perspective on how the land-use and grant-acceptance decisions of third parties working for Petitioners have created the very environmental hazards they now challenge.

## INTRODUCTION

This case is not about the EPA's failure to regulate; it is about the Petitioners' failure to plan. For over a decade, the State of Washington and its local coalition have engaged in a "de-industrialization-for-grants" scheme, guided by third-party NGO contractors and international methodologies. By statutorily opting out of industrial and agricultural self-sufficiency to prioritize "residential-only" development, Petitioners have voluntarily engineered a dependency on international shipping and air cargo.

While Petitioners characterize the EPA's Rescission as irreparable harm, the evidentiary record demonstrates that the injury is self-inflicted. Petitioners have traded domestic manufacturing for an international consumption-based economy that relies on the world's most polluting fuels. Under the Supreme Court's recent guidance in *Seven County Infrastructure Coalition v. Eagle County* (2025), the EPA cannot be held as the legally relevant cause of environmental effects flowing from these independent sovereign and contractual choices.

## STATEMENT OF THE CASE

The 2009 Greenhouse Gas Endangerment Finding set in motion a "Leveraging Trail" of federal financial mechanisms. By executing EPA Form 4700-4, third-party NGO contractors working for Petitioners committed to

2

mirroring federal standards in exchange for millions in "Capacity Building" and other EPA grants. This bound the Petitioners to a "residential-first" model that prioritizes federal grant eligibility over local industrial health.

Worthington's motion for judicial notice shows records from ICLEI and NODC reveal that Petitioners' policy baselines are dictated by international contractual obligations managed through NGOs. These organizations operate outside the transparency of the Administrative Procedure Act (APA), as noted in *Cascade Bicycle Club v. Puget Sound Regional Council* (PSRC), 175 Wn. App. 494 (2013). This "outside the wheelhouse" governance has produced a 72% gap in local vegetable consumption, forcing a reliance on maritime and air imports funneling through the Strait of Juan de Fuca through the jet stream. The EPA's Rescission is a lawful correction of these perverse incentives.

## PROCEEDINGS BELOW

The United States Environmental Protection Agency ("EPA") issued the 2009 Greenhouse Gas Endangerment Finding as a foundational regulatory mechanism under Section 202(a) of the Clean Air Act. For over fifteen years, this Finding has been utilized by the State of Washington, King County, and their coalition as a "regulatory lever" to dismantle domestic industrial capacity in favor of a consumption-based economy. This transition has been managed primarily

3

through third-party NGO contractors operating under international methodologies that bypass established state and federal administrative safeguards.

On February 18, 2026, the EPA published its Final Rule, *Rescission of the 2009 Greenhouse Gas Endangerment Finding and Repeal of Vehicle Emission Standards*. While the official administrative record presents a specific regulatory narrative, Amicus notes a significant transparency gap regarding the Agency's internal deliberations. Specifically, an EPA communication—currently the subject of Amicus's concurrent Motion to Supplement the Record—reveals that the broader implications of this rule, particularly concerning international maritime emissions and global leveraging, were viewed internally as sitting outside the Agency's land-based motor vehicle "wheelhouse."

In response to the Rescission, Petitioners filed this Petition for Review, alleging that the rule causes "irreparable harm" to public health. However, these proceedings must be viewed through the lens of Petitioners' own voluntary actions. As documented in the evidentiary record, the environmental shifts cited by Petitioners are not the result of the EPA's action but are the direct consequence of Petitioners' own statutory opt-outs under RCW 36.70A.070(7) and parallel codes in twenty-six other jurisdictions. [Exhibit A ADD. 2]. These proceedings follow a decade-long trajectory where Petitioners delegated planning authority to

4

NGOs that do not adhere to Administrative Procedure Act (APA) mandates, effectively insulating their policy choices from judicial and public oversight. *See Cascade Bicycle Club v. PSRC*, 175 Wn. App. 494 (2013).

## SUMMARY OF THE ARGUMENT

The State and local coalition Petitioners lacks Article III standing to preserve a 2009 Finding that has served as a "regulatory lever" to dismantle domestic industry while incentivizing a massive increase in unregulated international shipping. The evidentiary record establishes that the State and local coalition Petitioners are not victims of federal policy change, but victims of voluntary third-party NGO contractor actions in a "de-industrialization-for-grants" scheme that have aligned themselves with ICLEI methodologies to prioritize an international consumption-based economy. The third-party NGO contractor working for Petitioners have created self-inflicted damages through "residential-only" planning by third parties that are not before the court." The EPA's Rescission corrects a regime of "regulatory asymmetry" that replaces local manufacturing and farming with a trade model dependent on the world's most polluting fuels: International Bunker Fuel and Air Jet Fuel.

## ARGUMENT

I.  **PETITIONERS LACK ARTICLE III STANDING BECAUSE THEIR ALLEGED INJURIES ARE "SELF-INFLICTED" BY THIRD-PARTIES.**

The State and local coalition Petitioners standing requires an injury that is "fairly traceable" to the challenged action and not the result of the "independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Critically, the D.C. Circuit has held that "self-inflicted harm doesn't satisfy the 'fairly traceable' requirement." *Brotherhood of Locomotive Eng'rs & Trainmen v. FRA*, 972 F.3d 83, 102 (D.C. Cir. 2020). The County, City growth management decisions being made in local NGO's as illustrated by Worthington's motion to take judicial notice, are the independent third-party actions which have deprived the State and local coalition Petitioners of Article III standing.

## II. THE STATE AND LOCAL COALITION PETITIONERS' "HARM" IS A SELF-INFLICTED RESULT OF STATUTORY CHOICE AND CONTRACTUAL LEVERAGING BY THIRD PARTIES.

The "Residential-Only" Statutory Opt-Out [Exhibit A ADD at 2]. Under RCW 36.70A.070(7), Washington law—implemented by third party NGO contractors working for the State and local coalition Petitioners explicitly allows a jurisdiction to "choose to be a residential community," exempting itself from mandatory economic and industrial planning. [Exhibit A ADD. at 2]. This "Statutory De-Industrialization Clause" proves the displacement of domestic manufacturing is a conscious, state-sanctioned policy. The third-party NGO's

6

working for Petitioners in the coalition of Petitioners has spent the last 14 years or more building unsustainable residential only communities and building "capacity" for an international consumption-based economy through nearly identical statutory opt-outs, including:

> Arizona (A.R.S. § 9-461.05); California (Cal. Gov. Code § 65852.24); Colorado (C.R.S. § 31-23-301); Delaware (22 Del. C. § 301); the District of Columbia (D.C. Code § 6-641.01); Hawaii (HRS § 205-2); Illinois (65 ILCS 5/11-13-1); Maine (30-A M.R.S. § 4326(3)); Maryland (Md. Code, Land Use § 3-102); Massachusetts (M.G.L. c. 40A § 3A); Michigan (MCL 125.3506); Minnesota (Minn. Stat. § 462.12); Nevada (NRS 278.250); New Jersey (N.J.S.A. 40:55D-62); New Mexico (NMSA 1978, § 3-21-1); New York (NY Gen. City Law § 20(24)); North Carolina (N.C.G.S. § 160D-501); Ohio (ORC § 519.02 and § 713.10); Oregon (OAR 660-004-0040 and ORS 227.090); Pennsylvania (53 P.S. § 10603); Rhode Island (R.I. Gen. Laws § 45-24-37 and § 45-22.2-6); Texas (Tex. Local Gov't Code § 211.003); the U.S. Virgin Islands (V.I. Code tit. 29, § 226); Vermont (24 V.S.A. § 4411, § 4348a, and § 4302); Virginia (Va. Code § 15.2-2280); Washington (RCW 36.70A.070(7)); and Wisconsin (Wis. Stat. § 62.23(7) and § 66.1001(2)(h).

By invoking these statutes to prioritize residential-only development and accept billions in associated federal "capacity" grants, third party NGO's working for Petitioners have voluntarily engineered the very dependency on international shipping and "transboundary" pollution they now cite as an injury. The only injury is to Worthington who breathes excessive bunker and jet fuels due to his location in the jet stream, federal and international leveraging and residential only development.

The 2009 Finding enabled a "Leveraging Trail" [Exhibit H ADD 80] of federal financial mechanisms. By signing EPA Form 4700-4, Washington and King County committed to mirroring federal standards in exchange for millions in "Capacity Building" grants and other EPA grants. This binds the third-party NGO's working for Petitioners to a "residential-first" model that prioritizes federal grant eligibility over local industrial health.

### III. INTERNATIONAL CONTRACTUAL GOVERNANCE CREATED NECESSARY THIRD PARTY [EXHIBIT E ADD. 19 ].

Records from ICLEI and NODC reveal that the policy baselines for Clallam County, King County, and the State of Washington are dictated by international contractual obligations managed through third-party NGOs. These organizations operate outside the transparency and procedural safeguards of the Administrative Procedure Act (APA), effectively insulating their planning decisions from public scrutiny. *See Cascade Bicycle Club v. Puget Sound Regional Council (PSRC)*, 175 Wn. App. 494 (2013) (holding that regional planning benchmarks are often non-mandatory and lack the same statutory enforcement as statewide targets). By committing to these global jurisdictional methodologies, the NGO contractors working for the Petitioners have prioritized a "consumption-based" international economy. This model necessitates the very surge in maritime and air cargo pollution that Petitioners now claim to lament,

8

directly harming the health and environment of residents like Mr. Worthington. [Exhibit E ADD. 19-64]. The Resulting "Strait Funnel" and the Consumption Gap.

## IV. PLANNED AGRICULTURAL FAILURE AND THE 72% GAP [EXHIBITS G ADD. 69 & A ADD. 2]

The third-party NGO's working for Petitioners' international contracts, "residential-first" mandate, [Exhibit A ADD. 2 ] and those listed above, has created a massive local food deficit. Despite a commodity value of $20.5B [Exhibit G ADD. 69], the State produces only 28% of the vegetables it consumes—leaving a 72% gap. This forced dependency on imports is a direct result of State, County and "coalition" policies prioritizing residential density over protected agricultural lands (RCW 36.70A.170).

## V. THE "STRAIT FUNNEL" EFFECT [EXHIBITS F ADD. 65, G ADD. 69, & H ADD. 80].

As a resident of Sequim, Intervenor suffers the consequences of this "leveraged" shift. [Exhibit H ADD. 80]. The Strait of Juan de Fuca acts as a 100-mile wind tunnel where prevailing WNW winds [Exhibit G ADD. 69] funnel PM2.5 and NOx from over 10,000 annual ship transits directly into the Sequim "rain shadow" [Exhibit F ADD. 65].

## VI. THE BUNKER FUEL AND AIR CARGO DIVERGENCE [EXHIBITS B ADD. 6, C ADD. 10, & D ADD. 16]

While the third-party NGO's working for Petitioners' target domestic

9

tailpipes, they facilitate a surge in International Bunker Fuel—which is explicitly excluded from national emission totals [Exhibit B, ADD. 6 Footnote 'b']. Since 2009, air cargo weight has increased 55% [Exhibit G ADD. 69], proving 68 times more carbon-intensive than maritime shipping [Exhibits C ADD. 10 & D ADD. 16].

## VII.  PETITIONERS LACK LIKELIHOOD OF SUCCESS ON THE MERITS.

### A. ABSENCE OF PROXIMATE CAUSATION UNDER SEVEN COUNTY INFRASTRUCTURE COALITION V. EAGLE COUNTY (2025).

The Supreme Court has clarified that an agency is not the "legally relevant cause" of effects it has no power to prevent. The EPA is not the cause of emissions resulting from third party NGO's working for Petitioners' independent choice to invoke the RCW 36.70A.070(7) "residential-only" decision [Exhibit A ADD. 2], the decision to accept federal grant leveraging [Exhibit H ADD. 8O] and the decision to build a world economy through the ICLEI [Exhibit E ADD. 19].

### B. CORRECTION OF PERVERSE INCENTIVES.

The EPA's Rescission is a lawful correction of a Finding that created "perverse incentives" for states and counties to trade regulated domestic industry for unregulated international "transboundary transport." [Exhibit H ADD. 80].

10

## CONCLUSION

The "harm" claimed by the State of Washington, King County and the "coalition" is caused by third party ICLEI contractors adopting unsustainable residential only community policies. These third-party ICLEI contractors are not before this court to give Article III standing to Washington, King County and the "coalition" Petitioners. Furthermore, their claims are a self-inflicted and the result of their own land-use statutes [Exhibit A ADD. 2], ICLEI commitments [Exhibit E ADD. 19], and the "Leveraging Trail" of federal grants, [Exhibit H ADD. 80] all done under the NGO non-APA political forum. By using these third parties outside the Administrative Procedure Act and to statutorily choose a "residential-only" path under RCW 36.70A.070(7) and other state statutes, State of Washington, King County and the "coalition" have voluntarily engineered the very dependency on international shipping they now cite as a grievance. The Court should deny the Petition for Review for lack of Article II standing and to prevent further harm to Worthington.

Dated: March 24, 2026.

Respectfully submitted,

/s/ John Worthington
John Worthington
303 S. 5TH Ave. G-53
Sequim WA. 98382

11

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief complies with the type-volume limitation because it contains 2091 words excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Cir. R. 32(a)(1). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typeface style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in 14-point Times New Roman font using Microsoft Word.

Dated: March 24, 2026,

Respectfully submitted,

/s/ John Worthington
John Worthington
303 S. 5TH Ave. G-53
Sequim WA. 98382

12

# CERTIFICATE OF SERVICE

I certify that on March 24, 2026, I caused a copy of the foregoing to be filed and served by e-mail to counsel of record. Participants in the case who are registered CM/ECF users will also be served by the CM/ECF system.

Respectfully submitted, this 24th day of March 2026.

Respectfully submitted,

/s/ John Worthington
    John Worthington
    303 S. 5TH Ave. G-53
    Sequim WA. 98382

No. 26-1037, 26-1038, 26-1039, 26-1043, 26-1051

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA

_____

WASHINGTON STATE, KING COUNTY, et al.,
*Petitioners,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondent.*

_____

## ON PETITION FOR REVIEW OF AN ACTION OF THE
## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

_____

## ADDENDUM OF STATUTES, REGULATIONS, AND EXHIBITS
## IN SUPPORT OF AMICUS CURIAE JOHN WORTHINGTON

_____

**John Worthington**
**303 S. 5TH Ave. G-53**
**Sequim WA. 98382**

## Addendum Table of Contents

| Exhibit | Document Description | Page |
|---|---|---|
| A | **Declaration of John Worthington** regarding standing, localized coastal impacts, and transboundary transport; includes **RCW 36.70A.070(7)** "Residential-Only" statutory opt-out. | ADD 2 |
| B | **U.S. EPA Inventory of GHG Emissions (Excerpts)**; Energy Chapter Footnote 'b' regarding the exclusion of international bunker fuels. | ADD 6 |
| C | **UNCTAD Review of Maritime Transport (Data)**; Global container freight traffic growth trends (1970–Present). | ADD 10 |
| D | **Statista / International Energy Agency (IEA) Records**; Fuel consumption and emission data for international shipping, and **EDGAR.** | ADD 16 |
| E | **ICLEI / NODC Local Funding and Policy Records**; Evidence of international contractual obligations and jurisdictional baseline methodology. | ADD 19 |
| F | **NASA / NOAA Meteorological Mapping**; Visual data of the Pacific jet stream and prevailing wind transport into the Strait of Juan de Fuca. | ADD 65 |
| G | **Western Washington Foodshed & Tonnage Trends (2009–2025)**; Data on the 72% agricultural consumption gap, 55% air cargo weight increase, and the "Strait Funnel" effect (NWS/NOAA). | ADD 69 |
| H | **Federal Leveraging Trail & Statements of Assurances**; EPA Form 4700-4, CPRG Grant records ($156M/$49.9M), and binding contractual tethering of WA state policy to federal mandates. | ADD 80 |

# EXHIBIT A

ADD 2

## DECLARATION OF JOHN WORTHINGTON

I, John Worthington, declare under penalty of perjury:

1. I reside in **Sequim, Washington**, on the **Strait of Juan de Fuca**.

2. I am directly impacted by transboundary air pollution (PM2.5, NOx, SOx) from international vessels transiting this corridor near my home.

3. I have observed a consistent increase in maritime traffic that affects my respiratory health and the environmental quality of my community.

4. The **2009 Endangerment Finding** was deficient because it created a "regulatory asymmetry" by imposing domestic burdens while leaving international shipping emissions unaddressed.

5. I support the **2026 Rescission** as a correction to a framework that incentivized "offshoring" and increased unaccounted-for transboundary pollution in my local airshed. Washington's GMA RCW 36.70A.070 (7) is self-inflicting because it creates emissions by allowing residential only communities that rely on shipping to be "sustainable."

Executed on March 24, 2026, at Sequim, Washington.

/s/ John Worthington

John Worthington
303 S. 5TH Ave. G-53
Sequim WA. 98382

ADD 3

S-0760.1

_____

## SENATE BILL 5461

_____

**State of Washington**      **69th Legislature**      **2025 Regular Session**

**By** Senators Lovelett and Short

AN ACT Relating to residential development in limited areas of more intensive rural development; and amending RCW 36.70A.070.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF WASHINGTON:

**Sec. 1.** RCW 36.70A.070 and 2024 c 135 s 1 are each amended to read as follows:

The comprehensive plan of a county or city that is required or chooses to plan under RCW 36.70A.040 shall consist of a map or maps, and descriptive text covering objectives, principles, and standards used to develop the comprehensive plan. The plan shall be an internally consistent document and all elements shall be consistent with the future land use map. A comprehensive plan shall be adopted and amended with public participation as provided in RCW 36.70A.140. Each comprehensive plan shall include a plan, scheme, or design for each of the following:

(1) A land use element designating the proposed general distribution and general location and extent of the uses of land, where appropriate, for agriculture, timber production, housing, commerce, industry, recreation, open spaces and green spaces, urban and community forests within the urban growth area, general aviation airports, public utilities, public facilities, and other land uses. The land use element shall include population densities, building

or strategies to accommodate the impacts of development are made concurrent with the development. These strategies may include active transportation facility improvements, increased or enhanced public transportation service, ride-sharing programs, demand management, and other transportation systems management strategies. For the purposes of this subsection (6), "concurrent with the development" means that improvements or strategies are in place at the time of development, or that a financial commitment is in place to complete the improvements or strategies within six years. If the collection of impact fees is delayed under RCW 82.02.050(3), the six-year period required by this subsection (6)(b) must begin after full payment of all impact fees is due to the county or city. A development proposal may not be denied for causing the level of service on a locally owned or locally or regionally operated transportation facility to decline below the standards adopted in the transportation element of the comprehensive plan where such impacts could be adequately mitigated through active transportation facility improvements, increased or enhanced public transportation service, ride-sharing programs, demand management, or other transportation systems management strategies funded by the development.

(c) The transportation element described in this subsection (6), the six-year plans required by RCW 35.77.010 for cities, RCW 36.81.121 for counties, and RCW 35.58.2795 for public transportation systems, and the ten-year investment program required by RCW 47.05.030 for the state, must be consistent.

(7) An economic development element establishing local goals, policies, objectives, and provisions for economic growth and vitality and a high quality of life. A city that has chosen to be a residential community is exempt from the economic development element requirement of this subsection.

(8) A park and recreation element that implements, and is consistent with, the capital facilities plan element as it relates to park and recreation facilities. The element shall include: (a) Estimates of park and recreation demand for at least a ten-year period; (b) an evaluation of facilities and service needs; (c) an evaluation of tree canopy coverage within the urban growth area; and (d) an evaluation of intergovernmental coordination opportunities to provide regional approaches for meeting park and recreational demand.

(9)(a) A climate change and resiliency element that is designed to result in reductions in overall greenhouse gas emissions and that

ADD 52                                            SB 5461

# EXHIBIT B

ADD 6


United States
Environmental Protection
Agency

EPA 430-R-25-003

# Inventory of U.S. Greenhouse Gas Emissions and Sinks

## 1990-2023

ADD 7

Table 3-66: $CO_2$ Emissions from Natural Gas Systems (MMT) ............................................... 3-106
Table 3-67: $CO_2$ Emissions from Natural Gas Systems (kt) ................................................... 3-106
Table 3-68: $N_2O$ Emissions from Natural Gas Systems (Metric Tons $CO_2$ Eq.) ................. 3-106
Table 3-69: $N_2O$ Emissions from Natural Gas Systems (Metric Tons $N_2O$) ........................ 3-107
Table 3-70: Approach 2 Quantitative Uncertainty Estimates for $CH_4$ and Non-combustion $CO_2$ Emissions from Natural Gas Systems (MMT $CO_2$ Eq. and Percent) ....................... 3-110
Table 3-71: Recalculations of $CO_2$ in Natural Gas Systems (MMT $CO_2$) ......................... 3-113
Table 3-72: Recalculations of $CH_4$ in Natural Gas Systems (MMT $CO_2$ Eq.) .................... 3-113
Table 3-73: GOA Offshore Production Vent and Leak National $CH_4$ Emissions (Metric Tons $CH_4$) ........................................................................................................ 3-115
Table 3-74: GOA Offshore Production Vent and Leak National $CO_2$ Emissions (Metric Tons $CO_2$) ........................................................................................................ 3-115
Table 3-75: Chemical Injection Pumps National $CH_4$ Emissions (Metric Tons $CH_4$) ......................... 3-115
Table 3-76: Pneumatic Controllers National $CH_4$ Emissions (Metric Tons $CH_4$) ............................... 3-115
Table 3-77: Liquids Unloading National $CH_4$ Emissions (Metric Tons $CH_4$) ................................... 3-116
Table 3-78: Wellpad Equipment Leaks National $CH_4$ Emissions (Metric Tons $CH_4$) ........................... 3-116
Table 3-79: Produced Water National $CH_4$ Emissions (Metric Tons $CH_4$) .................................... 3-117
Table 3-80: Kimray Pumps National $CH_4$ Emissions (Metric Tons $CH_4$) ..................................... 3-117
Table 3-81: G&B Storage Tanks National Emissions (Metric Tons $CH_4$) .................................... 3-117
Table 3-82: G&B Station Blowdowns National Emissions (Metric Tons $CH_4$) ............................... 3-117
Table 3-83: G&B Pneumatic Controllers National Emissions (Metric Tons $CH_4$) ........................... 3-118
Table 3-84: G&B Dehydrator Vent National Emissions (Metric Tons $CH_4$) .................................. 3-118
Table 3-85: Processing Segment AGR National $CO_2$ Emissions (kt $CO_2$) ................................ 3-118
Table 3-86: Processing Blowdowns National $CH_4$ Emissions (Metric Tons $CH_4$) ....................... 3-119
Table 3-87: LNG Export Terminals National $CO_2$ Emissions (kt $CO_2$) .................................... 3-119
Table 3-88: $CH_4$ Emissions from Abandoned Oil and Gas Wells (MMT $CO_2$ Eq.) .................... 3-121
Table 3-89: $CH_4$ Emissions from Abandoned Oil and Gas Wells (kt) .................................... 3-121
Table 3-90: $CO_2$ Emissions from Abandoned Oil and Gas Wells (MMT $CO_2$) ...................... 3-121
Table 3-91: $CO_2$ Emissions from Abandoned Oil and Gas Wells (kt) .................................... 3-121
Table 3-92: Abandoned Oil Wells Activity Data, $CH_4$ and $CO_2$ Emissions (kt) ..................... 3-122
Table 3-93: Abandoned Gas Wells Activity Data, $CH_4$ and $CO_2$ Emissions (kt) .................. 3-123
Table 3-94: Approach 2 Quantitative Uncertainty Estimates for $CH_4$ and $CO_2$ Emissions from Petroleum and Natural Gas Systems (MMT $CO_2$ Eq. and Percent) ................................. 3-124
Table 3-95: Emission from TIGS (kt $CO_2$) ........................................................................ 3-125
Table 3-96: Allocation of Sequestered $CO_2$ for *Inventory* Adjustment (kt $CO_2$) .............. 3-126
Table 3-97: Pipeline Mileage (Miles) ............................................................................... 3-127
Table 3-98: Emissions from Injection and Storage (kt $CO_2$) ............................................ 3-128
Table 3-99: Sequestered $CO_2$ (kt $CO_2$) .................................................................... 3-128
Table 3-100: Percentage of $CO_2$ (kt) Supplied to EOR from Different Sources ................... 3-129
Table 3-101: Approach 2 Quantitative Uncertainty Estimates for $CO_2$ Emissions from TIGS (kt $CO_2$ Eq. and Percent) ................................................................................... 3-130
Table 3-102: $CO_2$, $CH_4$, and $N_2O$ Emissions from International Bunker Fuels (MMT $CO_2$ Eq.) ............ 3-133
Table 3-103: $CO_2$, $CH_4$, and $N_2O$ Emissions from International Bunker Fuels (kt) ........................... 3-133
Table 3-104: Aviation Jet Fuel Consumption for International Transport (TBtu) ..................... 3-135
Table 3-105: Marine Fuel Consumption for International Transport (Million Gallons) .............. 3-135
Table 3-106: $CO_2$ Emissions from Wood Consumption by End-Use Sector (MMT $CO_2$ Eq.) .............. 3-138

| Gas/Source | 1990 | 2005 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|
| **Total Gross Emissions (Sources)** | **6,538.3** | **7,505.3** | **6,597.4** | **6,005.7** | **6,333.8** | **6,344.1** | **6,197.3** |
| **LULUCF Emissions[c]** | **59.1** | **71.8** | **63.2** | **82.6** | **81.0** | **68.6** | **60.6** |
| $CH_4$ | 54.4 | 60.9 | 56.1 | 69.0 | 67.8 | 59.6 | 54.7 |
| $N_2O$ | 4.7 | 10.9 | 7.0 | 13.7 | 13.1 | 9.0 | 5.9 |
| **LULUCF Carbon Stock Change[e]** | **(1,096.9)** | **(1,040.7)** | **(982.6)** | **(1,034.2)** | **(1,043.8)** | **(973.9)** | **(1,000.5)** |
| **LULUCF Sector Net Total[f]** | **(1,037.9)** | **(968.9)** | **(919.4)** | **(951.6)** | **(962.9)** | **(905.3)** | **(939.9)** |
| **Net Emissions (Sources and Sinks)** | **5,500.4** | **6,536.4** | **5,678.0** | **5,054.2** | **5,371.0** | **5,438.7** | **5,257.4** |

+ Does not exceed 0.05 MMT $CO_2$ Eq.

[a] Emissions from biomass and biofuel consumption are not included specifically in Energy sector totals. Net carbon fluxes from changes in biogenic carbon reservoirs are accounted for in the estimates for LULUCF.

[b] Emissions from international bunker fuels are not included in totals.

[c] LULUCF emissions of $CH_4$ and $N_2O$ are reported separately from gross emissions totals. LULUCF emissions include the $CH_4$ and $N_2O$ emissions reported for peatlands remaining peatlands, forest fires, drained organic soils, grassland fires, and coastal wetlands remaining coastal wetlands; $CH_4$ emissions from land converted to coastal wetlands, flooded land remaining flooded land, and land converted to flooded land; and $N_2O$ emissions from forest soils and settlement soils. Refer to Table 2-8 for a breakout of emissions and removals for LULUCF by gas and source category.

[d] Small amounts of PFC emissions from this source are included under HFCs due to confidential business information.

[e] LULUCF carbon stock change is the net carbon stock change from the following categories: forest land remaining forest land, land converted to forest land, cropland remaining cropland, land converted to cropland, grassland remaining grassland, land converted to grassland, wetlands remaining wetlands, land converted to wetlands, settlements remaining settlements, and land converted to settlements. Refer to Table 2-8 for a breakout of emissions and removals for LULUCF by gas and source category.

[f] The LULUCF sector net total is the net sum of all LULUCF $CH_4$ and $N_2O$ emissions to the atmosphere plus LULUCF net carbon stock changes.

Notes: Total (gross) emissions are presented without LULUCF. Net emissions are presented with LULUCF. Totals may not sum due to independent rounding. Parentheses indicate negative values or sequestration.

## Table 2-2: Recent Trends in U.S. Greenhouse Gas Emissions and Sinks by Gas (kt)

| Gas/Source | 1990 | 2005 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|
| $CO_2$ | 5,131,761 | 6,126,903 | 5,235,912 | 4,689,954 | 5,020,111 | 5,055,403 | 4,918,407 |
| Fossil Fuel Combustion | 4,752,234 | 5,744,138 | 4,852,647 | 4,342,309 | 4,654,629 | 4,702,769 | 4,559,379 |
| *Transportation* | 1,468,944 | 1,858,552 | 1,816,636 | 1,572,955 | 1,753,546 | 1,753,554 | 1,776,451 |
| *Electric Power Sector* | 1,819,951 | 2,400,057 | 1,606,721 | 1,439,566 | 1,540,933 | 1,531,678 | 1,414,177 |
| *Industrial* | 876,470 | 847,643 | 809,823 | 763,421 | 780,475 | 799,677 | 792,620 |
| *Residential* | 338,568 | 358,898 | 342,905 | 314,795 | 318,034 | 335,172 | 307,077 |
| *Commercial* | 228,293 | 227,130 | 251,749 | 229,264 | 237,528 | 259,182 | 244,161 |
| *U.S. Territories* | 20,010 | 51,857 | 24,813 | 22,308 | 24,114 | 23,506 | 24,893 |
| Non-Energy Use of Fuels | 99,104 | 124,988 | 106,487 | 97,881 | 111,718 | 101,697 | 107,069 |
| Iron and Steel Production & Metallurgical Coke Production | 104,738 | 70,078 | 46,835 | 40,675 | 47,218 | 45,157 | 46,240 |
| Cement Production | 33,484 | 46,194 | 40,896 | 40,688 | 41,312 | 41,884 | 40,636 |
| Natural Gas Systems | 32,525 | 26,325 | 38,696 | 36,810 | 35,745 | 36,410 | 37,682 |
| Petrochemical Production | 20,075 | 26,882 | 28,483 | 27,926 | 30,656 | 28,788 | 30,540 |
| Petroleum Systems | 9,597 | 10,222 | 45,445 | 28,876 | 24,091 | 22,084 | 23,272 |
| Incineration of Waste | 12,900 | 13,254 | 12,948 | 12,921 | 12,476 | 12,484 | 12,425 |
| Ammonia Production | 14,404 | 10,234 | 12,388 | 12,335 | 11,458 | 11,945 | 12,211 |
| Lime Production | 11,700 | 14,552 | 12,112 | 11,299 | 11,870 | 12,208 | 11,548 |
| Other Process Uses of Carbonates | 7,103 | 8,472 | 8,973 | 9,012 | 8,583 | 10,383 | 7,163 |

ADD 9

# EXHIBIT C

## History

Container Shipping History in Charts

November 17, 2015 No Comments

**Save**



Container ships at the Port of Oakland

*Updated below*

After my review of The Box and my port mapping exercise, I thought I'd sail back into port and unload a few port-related charts.

The first shows the growth of three big West Coast ports: Los Angeles, Long Beach and Oakland. As international trade has expanded and the container shipping industry has become more efficient, the number of containers moving through the ports has increased dramatically for the Southern California ports and increased modestly for Oakland. To measure throughput, the container shipping industry often uses the "TEU," which stands for "twenty-foot equivalent unit." Since containers are multiple sizes, they are all scaled to

ADD 11

20-foot length when it's time to count: a 30-foot long container is 1.5 TEU, a 15-foot is 0.75 TEU, and so on.

Between 2004 and 2014, the Port of LA increased its TEU count by 3.3 times [1]; the Port of Long Beach raised its throughput by 2.2 times [2]; and Oakland increased its TEU count by 1.6 times [3]. The 2008 Great Recession and subsequent (partial) recovery are clearly visible in the data.



• Los Angeles    • Oakland    • Long Beach

Sources: Port of L.A. from [1], Port of L.B. from [2], Port of Oakland from [3]

It took major infrastructure investments to make this growth possible — new terminals, bigger cranes, harbor dredging, railroad upgrades, investments in trucks, to name a few — so it would be interesting to chart the capital expenditures at the ports, both private and public. Do they track TEU growth? Is the rapid increase at Long Beach between 2003 and 2006 the result of one or more new terminals opening? I didn't feel like digging for that

ADD 12

information this month, but maybe some other time (The public expenditures should be available, though possibly scattered among different sources, e.g., state, county, city, ports. Or perhaps there is a report out there that nicely summarizes it all.).

Worldwide, the growth in container shipping has also been dramatic, as the next chart indicates [4]. Between 1980 and 2013 the mass of material shipped in containers increased by almost 16-fold. Again, the 2008 recession is apparent.



Source:  United Nations Conference on Trade and Development [4]

As worldwide container trade has grown, so have container ships.  The next figure shows the average and maximum size ship for 1980-2004 (average) or 1980-2013 (maximum) [5]. The average is slowly creeping up (the lifetime of a container ship is a few decades). The size of the biggest ship is growing faster.  This makes sense since that is a measure of a *single* ship, something that could have been a vanity project (much like the eternal quest for the tallest building). Eventually, the size of the biggest ship will stop growing for a few reasons: if too deep, fewer ports are available; if too wide, cranes can't reach the containers; if it holds too many containers, the loading/unloading time could be problematic (shippers want to keep their ships at sea as much as possible, not tied up at the dock).

ADD 13



Data from references in note [5]

I suspect that port-side equipment improvements and ship size have tracked closely since it's not economically effective to have ships that are too large for the shore-size equipment, that can't get into the port, or that take too long to unload. There is quite a bit of time between placing an order for a new ship and taking delivery, so the shippers and ports have probably been working together so that port equipment is ready when large ships make their first calls.

A long piece from City Lab had this nice summary of the big ship situation:

By the late 1980s, 4,500 TEUs were being transported on Panamax class ships that were able to fit—just barely—through the Panama Canal. Post-Panamax ships, too big for the canal, soon began plying other routes, and by the 2000s were carrying 8,000-plus TEUs. Today, the Triple E class container ships built for Maersk Line are the world's largest ships, first brought into service by the shipping giant in 2013. The Triple E class can hold 18,000 TEUs. That's enough to transport 111 million pairs of sneakers, or enough to shoe over one-third of the United States in a single trip. The Triple E is 1,300 feet long (a quarter of a mile), 194 feet wide, and 240 feet high. It is a floating Empire State Building.

An expansion of the Panama Canal is underway and expected to be completed in mid-2016. After the wider canal opens, it will allow "New Panamax" ships of 12,000-13,000 TEUs to pass through.

ADD 14

*Update, 12/3/15*: Via SFist, news that the Port of Oakland is upgrading 4 of their 33 cranes to handle ships that carry as many as 14,000 TEUs. The project will cost $13.95 million, begin in April, and last 10-12 weeks.

*Update, 1/18/16*: Quartz has a piece about the *CMA CGM Benjamin Franklin*, a container ship that is 396 meters long and 54 meters wide with a capacity of 18,000 TEUs. Recently it became the largest container ship to visit a California port. These first visits were more of a dress rehearsal for future visits by this and other huge ships — determining if upgraded equipment is ready, improving preparation protocols and so forth. The article includes a chart showing that shipping capacity is growing faster than demand for shipping capacity. Some great photos of the visit are on the Flickr pages of Atsushi Kumagai, the Port of Oakland, and photo101.

Switching gears away from charts, I'll end with shout outs to three other port-related sites. First, the art of Mike Kimball, an artist who draws inspiration for some of his work from the ports. He frequently shows work at the City Art Gallery in San Francisco and his personal webpage has a few collections of his port-related work, like this one. Second, a huge collection container photos and info about each one is on the The Intermodal Container Web Page. They aren't intended as fine art, but it's possible to see artistic value in the photos. Third, KCRW radio's five-part Cargoland series looks at a variety of topics like automation and how workers get hired.

**References**
[1] Port of Los Angeles
[2] Port of Long Beach
[3] Port of Oakland
[4] Container freight data from Figure 1.2 in Review of Maritime Transport 2014, United Nations Conference on Trade and Development. (PDF)
[5] Average and largest ship data for 1980-2004 from Slide 27 in presentation called "Global Economic Trends in the Shipping and Terminal Industries," by Drewry Shipping Consultants Ltd and Aegir Port Property Consultants, presented at AAPA Joint Public Relations & Maritime Economic Development Seminar, Galveston, Texas, April 5, 2005 (PDF). Largest ship for 2013 from gCaptain.

# EXHIBIT D

ADD 16



CrowdStrike®
2026 Global Threat Report

DOWNLOAD

Energy & Environment › Emissions



PREMIUM +

# Carbon dioxide emissions from international shipping worldwide from 1970 to 2023

*(in million metric tons)*



### Carbon dioxide emissions from international shipping worldwide from 1970 to 2021

*(in million metric tons)*



## Global international shipping CO$_2$ emissions 1970-2023

Published by Lucía Fernández, Nov 28, 2025

International shipping carbon dioxide emissions increased 2% in 2023 to 856 million metric tons (MtCO$_2$), marking a third consecutive year of growth following a 2020 pandemic-related slump. These emissions, which have doubled since 1990, now represent approximately 10% of total global transportation CO$_2$ emissions. For more data, see the report from Statista.

This is supported by **EDGAR Database (2024 Release) and IEA (2023 Report).**

ADD 17



# EXHIBIT E

ADD 19



# ICLEI
# Local Governments for Sustainability

Founded 1990 as the

International Council for Local Environmental Initiatives

# Charter

**ICLEI Council approved by consensus on 12 April 2021**

ADD 20

Article 1. Name, Seat and Purposes ..................................................................................4

Charter 1.1 - Name ...........................................................................................................4

Charter 1.2 - Seat .............................................................................................................4

Charter 1.3 - Mission ........................................................................................................4

Charter 1.4 - General Mandate .........................................................................................4

Charter 1.5 - Work Mandate .............................................................................................4

Charter 1.6 - Representation Mandate ..............................................................................5

Charter 1.7 - Principles .....................................................................................................5

Article 2. The Association and its Members ....................................................................6

Charter 2.1 – Definitions ...................................................................................................6

Charter 2.2 – Eligibility for Membership ..........................................................................7

Charter 2.3 - Obtaining Membership .................................................................................7

Charter 2.4 - Termination of Membership .........................................................................7

Charter 2.5 – Obligations of Members ..............................................................................7

Charter 2.6 – Opportunities of Membership ......................................................................7

Article 3. Council ...............................................................................................................7

Charter 3.1 – Mandate and powers of the Council ............................................................7

Charter 3.2 – Constitution and term of the Council ..........................................................8

Charter 3.3 - Meetings of the Council ...............................................................................8

Charter 3.4 - Procedure .....................................................................................................8

Article 4. Executive Committee .......................................................................................8

Charter 4.1.– Executive Committee ...................................................................................8

Charter 4.2 – Regional Executive Committees...................................................................8

Charter 4.3 – Global Executive Committee .......................................................................9

Charter 4.4 - Eligibility for Regional or Global Executive Committee .............................9

Charter 4.5 - Geographical Representation ........................................................................9

Charter 4.6 – Office ..........................................................................................................10

Charter 4.7 - Vacant Seats ...............................................................................................10

Charter 4.8 - President, First Vice President, Vice President ...........................................10

Charter 4.9 – Meetings and decision making ...................................................................10

Charter 4.10 - Management Committee ............................................................................10

ADD 21

**Charter 4.11 – Committees** ..................................................................10

**Article 5 – Special bodies**..................................................................10

**Charter 5.1 – Initiation**......................................................................10

**Charter 5.2 – Terms of Reference** ...................................................11

**Article 6 – Partners**...........................................................................11

**Charter 6 - Partners**...........................................................................11

**Article 7. Secretary General**............................................................11

**Charter 7.1 – Appointment** ..............................................................11

**Charter 7.2 – Powers of the Secretary General** ...........................11

**Charter 7.3 Offices**............................................................................11

**Article 8. Legal provisions**...............................................................12

**Charter 8.1 - Liabilities and Legal Affairs** ...................................12

**Charter 8.2 – Dissolution and Liquidation** ...................................12

ADD 22

## Charter

The Charter serves as the primary statute of the association.

## Article 1. Name, Seat and Mandate

## Charter 1.1 - Name

ICLEI – Local Governments for Sustainability (hereafter referred to as the "Association") was established as an international local government association in the year 1990. From its founding until 31 December 2003, the Association bore the name "International Council for Local Environmental Initiatives (ICLEI)".

## Charter 1.2 - Seat

The Association's seat shall be the location of its international headquarters (World Secretariat).

## Charter 1.3 - Mission

The Association's Mission shall be to build and serve a worldwide movement of local governments to achieve tangible improvements in global sustainability with special focus on environmental conditions through cumulative local actions.

## Charter 1.4 - General Mandate

The Association shall build an active and committed municipal membership of local spheres of government (local and regional governments and authorities) as well as international, regional, national and sub-national local-government associations.

## Charter 1.5 - Work Mandate

To support its Members, the Association shall:

(a) mobilize and provide support to local-level initiatives that address specific priority problems of local and global significance;

(b) help develop and strengthen local capacity and expertise;

(c) support networking among and exchange of experiences between local governments, especially between developing and industrialized countries;

(d) work with groups of local governments and partner organizations in order to research, develop, pilot and implement local initiatives for sustainability;

(e) function as a clearinghouse for information, and as a training center, on local sustainable development and environmental policies and programs;

(f) provide technical support services and consultancy to aid the implementation of local sustainable development and environmental policies and programs;

(g) evaluate and report on the impacts of local actions;

(h) work with private corporations and research institutes to develop and exchange environmental knowledge and appropriate environmental technologies;

(i) promote the role of local government as a necessary innovator and implementer of sustainable development and environmental policy;

Page 4 of 12

ADD 23




United States, North America

**Jefferson County, WA**

Profile    Website

| COUNTY COMMISSIONER | POPULATION | POPULATION YEAR | MEMBER SINCE |
|---|---|---|---|
| Kate Dean | 31729 | 2018 | 01/04/2019 |

**Related activities**




United States, North America

**City of Port Angeles, WA**

Profile

| MAYOR | POPULATION | POPULATION YEAR | MEMBER SINCE |
|---|---|---|---|
| Kate Dexter | 20076 | 2018 | 01/10/2019 |




United States, North America

**Jamestown S'Klallam Tribe of Washington, WA**

Profile

| TRIBAL COUNCIL/TEO EXECUTIVE DIRECTOR | POPULATION | POPULATION YEAR | MEMBER SINCE |
|---|---|---|---|
| Rochelle Blankenship | 594 | 2012 | 01/04/2022 |

ADD 24

USCA Case #26-1061     Document #2166706          Filed: 03/31/2026     Page 48 of 109



**The Local Agenda 21**

**Planning Guide**

**AN INTRODUCTION TO**

**SUSTAINABIE DLVELOPMENT PLANNING**

Published by

The International Council for Local Environmental Initiatives (ICLEI)

Local Agenda 21 Initiative

City Hall, East Tower, 8th Floor, Toronto, ON, Canada, M5H 2N2

and

The International Development Research Centre (IDRC)

PO Box 8500, Ottawa, ON, Canada, K1G 3H9

and

The United Nations Environment Programme (UNEP)

Department of Information and Public Affairs,

PO Box 30552 Nairobi, Kenya

©1996, International Council for Local Environmental Initiatives (ICLEI) and

International Development Research Centre (IDRC)

Canadian Cataloguing in Publication Data

Main entry under title:

The Local Agenda 21 Planning Guide

"In June 1992, the United Nations Conference on Environment and Development

adopted Agenda 21, the global action plan for sustainable development."—Introd.

Includes bibliographical references, case studies

ISBN: 0-88936-801-5

1. Sustainable Development —Planning—Handbooks, Manuals, etc.

2. Community Development—Environmental aspects—Planning—Handbooks,

manuals, etc.

3. Economic Development—Environmental aspects—Planning—Handbooks,

manuals, etc.

I. International Council for Local Environmental Initiatives

II. International Development Research Centre (Canada)

HC79.E5157 1996          338.9     C96-980128-9

Legal deposit: 2nd quarter 1996

National Library of Canada

A microfiche edition is available

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, or otherwise, without the prior permission of the International Development Research Centre (IDRC) and the International Council for Local Environmental Initiatives (ICLEI).

All paper used is recycled as well as recyclable. All inks and coatings are vegetable-based products.

Designed by Hambly and Woolley Inc., Toronto, Canada

Illustrations by Normand Cousineau/Link

Printed in Canada

## FOREWORD

### By Maurice Strong Chairman, Earth Council

In 1992, the leaders of 179 countries gathered in Rio de Janeiro for the United Nations Earth Summit to finalize a global action plan for sustainable development, called Agenda 21. In this document, they recognized that because "so many of the problems and solutions being addressed by *Agenda 21* have their roots in local activities, the participation and cooperation of local authorities will be a

ADD 27

determining factor in fulfilling its objectives." *Agenda 21* further calls upon local authorities in every country "to undertake a consultative process with their populations and achieve a consensus on 'Local Agenda 21' for their communities." When this mandate was set out in 1992, there was little information available on how to proceed. It therefore gives me particular satisfaction to report that, since 1992, more than 1,300 local authorities from 31 countries have responded to the Agenda 21 mandate by developing their own Local Agenda 21 action plans for sustainable development.

The task of mobilizing and technically supporting Local Agenda 21 planning in these communities has been led by the International Council for Local Environmental Initiatives (ICLEI) and national associations of local government. Now, with the further support of the International Development Research Centre and the United Nations Environment Programme, ICLEI is able to present the first worldwide documentation of Local Agenda 21 planning approaches, methods, and tools in this *Local Agenda 21 Planning Guide.*

The planning framework presented in the Guide has been derived from real-life Local Agenda 21 planning efforts around the world. The framework is being tested and reviewed by municipal professionals from 14 countries, North and South, East and West. The Guide should therefore provide a very useful introduction and

ADD 28

technical resource on Local Agenda 21 planning to municipal professionals and NGOs facing a variety of development conditions.

The transition to sustainable development is not a soft option, but an imperative for our survival and well-being. It is going to require a great deal of courage and commitment from all sectors, including municipalities, to ensure its success. Even as urban areas increasingly represent a concentration of our greatest social, economic, and environmental problems, they offer opportunities for some of the most effective solutions. They encompass great pools of talent and expertise within their many sectors, which local government officials can pull together to work on local strategies for action.

In my parting words at the conclusion of the Earth Summit, I said that we all "must move down from the Summit and into the trenches where the real world actions and decisions are taken that will, in the final analysis, determine whether the vision of Rio will be fulfilled and the agreements reached there implemented." Of the many programs that have resulted from the Earth Summit, none is more promising or important than this one, which has hundreds of local authorities around the world now setting out and implementing their Local Agenda 21s.

Maurice Strong

**FOREWORD**

**By Elizabeth Dowdeswell Executive Director, United Nations Environment Programme (UNEP)**

Today, humanity is on the move as never before. Driven from the countryside by political turmoil, population pressures, and ecological breakdown, most of those who head for the city do so to seek a better quality of life.

But this massive movement has only further strained the resources and infrastructure of already overburdened cities. The most explosive growth has been in the Third World, which has 213 cities of more than a million people and some 20 at the 10 million mark. The blanket of smog that hangs over cities such as Rio de Janeiro, Mexico City, Delhi, Beijing, and tens of thousands of smaller cities is symbolic of more critical problems—of vulnerability to environmental sanitation problems, to natural disasters, and to man-made disasters such as chemical plant accidents and urban fires.

The increasing pace of global integration will determine whether in the future the lines that separate a city, a country, a region, and a continent will become progressively more blurred. But one thing is clear: the fate of cities will determine, more and more, not only the fate of nations but also of our planet. We can afford to ignore the issue of the sustainable management of our cities only at our peril.

How can sustainable development be made meaningful at the local level? How can we develop systems to involve the stakeholders in devising appropriate solutions to

ADD 30

local environment and development issues? How can the quality of municipal services be improved and integrated to address the environmental, economic, and social prospects of the communities?

These questions are critical, especially since terms like sustainable development and environmental conservation can often conjure up images of processes too grand for local communities and their organizations to handle and influence. Clearly, sustainable development at the municipal level requires an entirely different approach to the planning and provision of services.

The *Local Agenda 21 Planning Guide,* prepared by the International Council for Local Environmental Initiatives (ICLEI), introduces just such an approach—a planning framework for sustainable development at the local level. In simplest terms, the Guide documents a process for developing action plans to address complex problems inherent in modern urbanized societies. It presents a framework for engaging local authorities with residents and local organizations in the design and provision of services to the community, while simultaneously protecting local, regional, and global ecosystems.

In presenting this planning framework, ICLEI has given us a book filled with insights that subvert many of our most basic assumptions and suggest fresh ways to think about them.

ADD 31

For all these reasons, the *Local Agenda 21 Planning Guide* is more than just another book. It is a lever for changing the art of managing sustainable development at the level of local government. Indeed this guide can serve as a symbol of today's historic transformation in the concept of partnerships—one that no informed person can afford to ignore.

Elizabeth Dowdeswell

**Table of Contents**

**Forewords**                                                                          **i**

**Table of Contents**                                                          **v**

**Preface**                                                                            **xi**

## CHAPTER ONE—SUSTAINABLE DEVELOPMENT: THE LOCAL CONTEXT

**1.0 What is Sustainable Development?**                                  **1**

1.0.1 How Can the Sustainable Development Concept Be Applied by Local Governments?                                                                              3

1.0.2 The Importance of Systems                                              3

**1.1 The Local Agenda 21 Mandate**                                      **4**

**1.2 How to Use the Local Agenda 21 Planning Guide**        **5**

**1.3 The Elements of Sustainable Development Planning**      **6**

1.3.1 Introduction                                                    6

1.3.2 Partnerships                                                    7

1.3.3 Community-Based Issue Analysis                                  9

1.3.4 Action Planning                                                9

1.3.5 Implementation and Monitoring                                  10

1.3.6 Evaluation and Feedback                                        11

CHAPTER TWO—PARTNERSHIPS

**2.0 Introduction**                                                 **13**

**2.1 Objectives**                                                   **14**

**2.2 Steps**                                                        **15**

2.2.1 Determine the Scope of Planning                                15

2.2.2 Create the Stakeholder Group                                   16

2.2.3 Design Working Groups                                          17

2.2.4 Identify Partners                                              20

2.2.5 Establish Terms of Reference                                   23

2.2.6 Develop a Common Community Vision                              24

**2.3 Cases**                                                        **24**

2.3.1 Case #1, Lancashire County, United Kingdom                     24

2.3.2 Case #2, The Provincial Municipality of Cajamarca, Peru        28

ADD 33

2.3.3 Case #3, The City of Santos, Brazil     32

2.3.4 Case #4, Johnstone Shire Council, Australia     35

## CHAPTER THREE—COMMUNITY-BASED ISSUE ANALYSIS

**3.0 Introduction**     **43**

**3.1 Steps**     **44**

3.1.1 Determine the Scope of the Issue Analysis Process     44

3.1.2 Identify the Issues to Be Analyzed     47

3.1.3 Implement Detailed Assessments     48

3.1.4 Complete the Issue Analysis     53

**3.2 Appendixes**     **55**

3.2.1 Appendix 1, Participatory Systems Analysis     55

3.2.2 Appendix 2, Rapid Urban Environmental Assessment (RUEA)     69

3.2.3 Appendix 3, Risk-Based Priority Setting and Comparative Risk Assessment     73

**3.3 Cases**     **78**

3.3.1 Case #5, Troyan, Bulgaria     78

3.3.2 Case #6, The Metropolitan District of Quito, Ecuador     84

3.3.3 Case #7, Greenpoint/Williamsburg, New York City, USA     87

3.3.4 Case #8, Lancashire County Council, United Kingdom     91

3.3.5 Case #9, Gothenburg, Sweden                                    94

CHAPTER FOUR—ACTION PLANNING

**4.0 Introduction**                                                 **97**

**4.1 Structure and Contents**                                       **98**

**4.2 Steps**                                                        **99**

4.2.1 Define the Action-Planning Process                            99

4.2.2 Review of the Community Vision and Findings from Community-    102

Based Issue Analysis

4.2.3 Establish Strategic Action Goals                              102

4.2.4 Set Targets and Triggers                                      103

4.2.5 Select Specific Implementation Strategies and Programs        106

4.2.6 Develop the Framework Action Plan                             107

4.2.7 Promote Implementation Partnerships                           107

**4.3 Appendix**                                                     **108**

4.3.1 Appendix 4, Force Field Analysis                              108

**4.4 Cases**                                                        **112**

4.4.1 Case #10, Los Angeles, USA                                    112

4.4.2 Case #11, Kanagawa Prefecture, Japan                          115

4.4.3 Case #12, Dar Es Salaam, United Republic Of Tanzania          120

ADD 35

# CHAPTER FIVE—IMPLEMENTATION AND MONITORING

**5.0 Introduction** — **125**

**5.1 Creating Effective Structures** — **126**

5.1.1 Jurisdictional Reform — 127

5.1.2 Decentralization — 127

5.1.3 Interdepartmental Coordination — 131

5.1.4 Quasi-Governmental and Community Agencies — 135

**5.2 Creating Effective Planning Linkages** — **139**

**5.3 Internal Auditing and Monitoring** — **140**

5.3.1 Internal Audit — 140

5.3.2 Reform of Procedures, Rules, and Standards — 141

5.3.3 Internal Management System — 141

5.3.4 Documentation — 145

**5.4 Conclusion** — **145**

**5.5 Cases** — **146**

5.5.1 Case #13, The Municipality of Jundiai, Brazil — 146

5.5.2 Case #14, Stockholm, Sweden — 149

5.5.3 Case #15, Graz, Austria — 155

5.5.4 Case #16, Ottawa, Canada — 162

## CHAPTER SIX—EVALUATION AND FEEDBACK

**6.0 Introduction**    **167**

**6.1 Reporting**    **168**

6.1.1 Performance Reporting    168

6.1.2 Progress Reporting    169

**6.2 Performance Measurement**    **171**

**6.3 Periodic Progress Review**    **176**

**6.4 Community Feedback**    **178**

**6.5 Cases**    **182**

6.5.1 Case #17, The Regional Municipality of Hamilton-Wentworth, Canada    182

6.5.2 Case #18, The Global Action Plan Project    187

Concluding Remarks    189

Glossary of Selected Methods and Tools for Sustainable Development Planning    191

Local Agenda 21 Resources    199

Contact Information    207

**List of Figures**

Figure 1: The Sustainable Development Challenge    2

ADD 37

Figure 2: The Elements of Sustainable Development Planning    8

Figure 3: A General Partnership Model    19

Figure 4: Lancashire's Local Agenda 21 Partnership    25

Figure 5: Lancashire's Local Agenda 21 Partnership Process    26

Figure 6: Inter-Institutional Consensus Building in Cajamarca, Peru    30

Figure 7: Organizational Structure and Partnership Arrangements for    37
Johnstone Plan Review

Figure 8: Johnstone Shire's Integrated Umbrella Action Plan    41

Figure 9: The Blueprint for Leicester Process    50

Figure 10: Materials Flow Analysis    56

Figure 11: System Diagram Illustrating Environmental Impacts of an    62
Infrastructure Project

Figure 12: Systems Model for Recreational Activities    63

Figure 13: Rapid Urban Environmental Assessment    70

Figure 14: Troyan Community Environmental Action Project: Flow Chart    80
of Activities

Figure 15: The Santa Monica Sustainability City Program    104

Figure 16: City of Ottawa Municipal Environmental Evaluation Process    165
(MEEP)

Figure 17: Example of Indicator Presentation in the "Life in Jacksonville" 177

Project

Figure 18: Hamilton-Wentworth's Sustainable Communnity Initiative  185

**List of Worksheets**

Worksheet 1: Identifying Partners for Stakeholder and Working Groups 21

Worksheet 2: Service Issues Map                                    59

Worksheet 3: The Connectivity Matrix                               66

Worksheet 4: Jurisdictional Coordination for Action Plan Implementation 128

Worksheet 5: Interdepartmental Coordination for Action Plan         132

Implementation

Worksheet 6: Coordination of Action Plan Implementation with Statutory 136

Planning Processes

Worksheet 7: Implementation Strategy for Action Plan Targets        142

**List of Checklists**

Checklist 1: Partner Selection for Sustainable Development Planning  22

Checklist 2: Community Based Issue Analysis                         54

**List of Boxes**

Box A: The Prosanear Project, Brazil                                45

Box B: Public Input into the Blueprint for Leicester               49

Box C: Systems Analysis: Technical Methods                         61

Box D: Citizen Report Cards, Bangalore, India                    170

Box E: The Effective Use of Indicators                           172

Box F: Performance Indicators—The Oregon Benchmark Program       179

**Preface**

The *Local Agenda 21 Planning Guide* has been prepared to assist local governments and their local partners to learn and undertake the challenging task of sustainable development planning. This planning approach is a fundamental first step that will enable them to provide the residents of their communities with basic human needs, rights, and economic opportunities, and at the same time ensure a vital, healthy, natural environment; in other words, a planning approach that will enable them to manage their cities, towns, and/or rural settlements in a sustainable way. The Guide offers tested and practical advice on how local governments can implement the United Nations' *Agenda 21* action plan for sustainable development and the related United Nations' *Habitat Agenda*.

The United Nations Conference on Environment and Development (UNCED) produced *Agenda 21* in 1992, and since that time *Agenda 21* has become the guiding international blueprint for development into the twenty-first century. During the preparation of *Agenda 21,* the International Council for Local Environmental Initiatives (ICLEI) worked to ensure that this global plan also addressed the roles and perspectives of local governments. As a result, Chapter 28

ADD 40

of *Agenda 21* calls upon local governments, working with their communities, to create their own local action plans, or Local Agenda 21 programs. The *Local Agenda 21 Planning Guide* presents a tested sustainable development planning approach for this process.

The *Local Agenda 21 Planning Guide* is based on more than five years of experience of cities and towns in all world regions that are in the process of integrating planning and action across economic, social, and environmental spheres. Today more than 1,300 local governments in 33 countries are engaged in Local Agenda 21 planning. During the past three years, ICLEI has been providing training and technical assistance to local planning efforts and has been building regional and international networks to support the worldwide Local Agenda 21 process. In particular, ICLEI's Local Agenda 21 Model Communities Programme (MCP) has supported 14 local governments in Africa, Asia and the Pacific, Europe, Latin America, and North America to work together to test and evaluate different planning approaches and methods. Their experiences and contributions have guided the development of the approach presented in this Guide. The approaches in this Guide are also based upon presentations and discussions in regional seminars held in Buga, Colombia, Hat Yai, Thailand, Johannesburg, South Africa, and Yokohama, Japan; these seminars involved more than 300 local government representatives from over 30 countries.

ADD 41

The contributions of all of these local governments have been invaluable to the definition and refinement of the approach presented in the Guide. In particular, ICLEI would like to thank the municipalities of: Buga, Colombia; Bulawayo, Zimbabwe; Cajamarca, Peru; Cape Town, South Africa; Durban, South Africa; Gothenburg, Sweden; Gulu, Uganda; Hamilton, New Zealand; Hamilton-Wentworth, Canada; Hat Yai, Thailand; Jinja, Uganda; Johannesburg, South Africa; Johnstone Shire, Australia; Kanagawa Prefecture, Japan; Lancashire County, UK; Leicester, UK; Machala, Ecuador; Manus Province, Papua New Guinea; Mwanza, Tanzania; Ottawa, Canada; Pimpri Chinchwad, India; Quito, Ecuador; Santa Monica, USA; and Santos, Brazil. Case studies of the local efforts of some of these cities are used to illustrate the different chapter topics of the Guide. Special recognition is also given to the work of the European Sustainable Cities and Towns Campaign, the Institute for Sustainable Communities in Vermont, the UK Local Government Management Board, and the ICLEI European Local Agenda 21 Programme.

Special thanks is due to current and past members of the ICLEI Executive Committee who gave the initial support and impetus to the Local Agenda 21 initiative, specifically, Sir John Chatfield, Dr. Helena Ribeiro Sobral, Dr. Siegfried

Brenke, Dr. Noel Brown, Mr. Jakob Eng, Dr. Jaime Lerner, Mr. Pekka Jalkanen, and Mr. Jaime Valenzuela.

Members of the ICLEI network who have been involved in the development of this Guide, either through the preparation of case studies, or the provision of materials and comments on the various drafts include: Mr. Lawrence Altros, Sr. Alvaro Saenz Andrade, Mr. Graham Alder, Mr. Mark Bekkering, Mr. Lars Berggrund, Ms. Sue Costello, Mr. Darryl Low Choy, Ms. Yasmin Dada, Ms. Siomara Gonzalez Gomes, Mr. A.G. Kyessi, Mr. Eddie McEachan, Mr. Paul Macdonald, Mr. Paul Markowitz, Ms. Ina Silva Martos, Sr. Salvador A. Munhoz, Mr. Steve Nicholas, Mr. Samuel Paul, Mr. Graham Pinfield, Mr. Derek Taylor, Ms. Yasmin Von Schirnding, and Mr. Sven-Erik Skogsfors.

ICLEI staff members and research associates who have made contributions at various times during the drafting process include: Mr. Stuart Baird, Ms. Laura Bugufia, Mr. Shem Chaibva, Ms. Tanya Imola, Ms. Heather Kepron, Ms. Miriam Landman, Ms. Christina Li, Mr. Neil Mallen, Mr. Michael Manolson, Mr. Sridhar Marisetti, Mr. Konrad Otto-Zimmermann, Ms. Maria Pata, Ms. Mary Pattenden, Sr. José Rodrigues, Mr. Chris Semonson, Ms. Effie Tziamouranis, Ms. Grace Visconti, Ms. Paula Vopni, and Ms. Judy Walker.

ADD 43

This Guide was written by an ICLEI staff team consisting of Mr. Jeb Brugmann, Ms. Charlene Easton, Ms. Prabha Khosla, and Dr. Pratibha Mehta. It was produced, managed and edited by Charlene Easton and Reena Lazar.

Support for the development and testing of the ideas in the Local Agenda 21 Planning Guide has been provided through the ICLEI LA 21 Model Communities Programme. Its supporters include: the International Development Research Centre (IDRC); the Canadian International Development Agency (CIDA); the Dutch Ministry of Foreign Affairs; the Japan Environment Agency; the United Nations Development Programme's (UNDP) LIFE Programme; and USAID (South Africa).

The publication of this Guide was made possible through the generous support of the International Development Research Centre (IDRC) of Canada and the United Nations Environment Programme (UNEP). We would particularly like to acknowledge the assistance and support of Ms. Denise Deby and Ms. Esther Beaudry of IDRC and Mr. Strike Mkandla and Ms. Mireille Strunck of UNEP for their support.

## 2.2.2 CREATE THE STAKEHOLDER GROUP

Partners are not ad hoc participants who occasionally share their opinions. On the contrary, they are expected to share responsibility for the planning process and its outcomes. Their involvement needs to be facilitated through an organizational

mechanism. In the cases provided with this chapter, each municipality established special organizational structures to oversee the partnership planning process. For some, this coordinating mechanism was external to the municipality. For others, it was internal to the municipal institution.

In Lancashire County, UK, an Environmental Forum was established to oversee and support their Local Agenda 21 effort. This Forum was made up of members from a broad range of stakeholder constituencies, including the municipality, and received staff support from a special municipal Environment Unit. The Environment Unit linked the Forum's planning efforts to internal municipal planning processes.

In Cajamarca, Peru, an Inter-Institutional Consensus-Building Committee made up of stakeholder representatives coordinated thematic working groups, public forums, and workshops to prepare and present project proposals to the Provincial Council.

In Santos, Brazil, all of the municipal Councils developed action proposals for their distinct areas of concern. Each Council is directly linked with a municipal secretariat or department to which it communicates its recommendations. Cross-seating between members of the various Councils is arranged to permit exchange between sectors.

In Johnstone Shire, Australia, a small municipal steering team provides the strategic vision and governs four theme-based stakeholder committees. These committees convene periodically to integrate their various planning activities. Coordinating bodies, or Stakeholder Groups, serve as the Boards of Directors for the planning effort and govern the planning process. The diversity and status of their stakeholder membership can provide both legitimacy and credibility to the planning effort. This broad-based membership can also facilitate the recruitment of participation from different sectors, the gathering of information, and the negotiation of agreements on controversial issues. It can build consensus on a strategic community vision, make final reviews of action plans, and hold the municipality and other implementing agencies accountable to agreed upon plans. In the case of both Lancashire and Cajamarca, the governing Stakeholder Groups were given direct mandates from their respective municipalities. Whatever the scope of the exercise, a clear mandate and authorization from the local government provides both democratic accountability and a close link with the official planning activities of government. This mandate should specify the roles and responsibilities of the Stakeholder Group. It should define what planning is to be undertaken, how results and recommendations will be reviewed by the municipality and other key institutions, and how the results will be used in statutory planning efforts, such as annual budgeting or development and structure plans.

Municipalities throughout the world are establishing special organizational structures, generally called "Stakeholder Groups" to oversee their partnership planning process.

### 2.2.3 DESIGN WORKING GROUPS

Because a sustainable development planning process involves a variety of activities, the Stakeholder Group will most likely wish to form partner-based organizational structures to implement the distinct elements of the planning process. The ambitious planning efforts in Lancashire, Santos, Cajamarca, and Johnstone Shire are designed to address a full array of local issues. In order to facilitate the participation of people from different disciplines, backgrounds, sectors, and levels of expertise in discussing these issues, the Stakeholder Groups established a variety of specialized Working Groups. These Working Groups undertook the distinct tasks of issue identification, problem analysis, technical research, priority setting, action planning and impact analysis, implementation and monitoring, and evaluation and feedback. Some structures were used to collect and analyze information or to develop action proposals; others were used to integrate action proposals with municipal plans; and still others were used to develop performance indicators and to evaluate progress in achieving targets.

A Working Group is typically a small body of 10 to 20 stakeholder representatives who have a particular interest or expertise in a specific issue or problem. In

ADD 47

addition to the various models presented in the diagrams accompanying the cases, a general diagram of a stakeholder planning process can be found in Figure 3. In this model, the Working Group plays a lead role in research, issue analysis, and technical assessment. It contributes its information and conclusions, as well as its action recommendations, to the larger Stakeholder Group for review and discussion. Based upon these recommendations, the Stakeholder Group negotiates and approves a final Action Plan.

The processes of issue identification and priority setting often require unique structures, such as neighborhood forums, public hearings, and focus groups, which permit extensive participation by residents and/or service users. A Working Group may be established to coordinate these activities. Technical analysis and research is usually coordinated by specialist Working Groups. In order to develop a systemic analysis of issues and problems, these Working Groups usually include representatives with expertise in different professional disciplines, municipal departments, and sectors.

The development of Action Plans is usually an iterative process in which specialist Working Groups prepare specific proposals and submit these to the larger Stakeholder Group—or directly to the public—for review, comments, and changes. A typical structure used in action planning is the Interdepartmental Committee of

municipal staff, which advises stakeholder Working Groups and reviews their action proposals prior to formal approval by municipal policymakers. Stakeholder Groups often establish distinct Working Groups to undertake the different tasks of issue identification, technical research, priority setting, and developing Action Plans.

FIGURE 3 **A GENERAL PARTNERSHIP MODEL Sustainable Development Planning**



- Home
- Projects
  - Planning
    - Energy Resilience
    - Broadband Initiative
    - Comprehensive Economic Development Strategy
  - Environment
  - Food, Farm & Forest
  - Business Development
  - Technical Assistance
- Events
- Resources
  - Demographics & Stats
  - Community Resources
- About
  - Our Team
  - Join Our Team
  - Contact
  - Donate

ADD 50

- Climate Action Toolkit
  - o About
  - o Climate Change Impacts
  - o Toolkit
    - Transportation and Land Use
    - Energy and Housing
    - Water Supply and Infrastructure
  - o Climate Integration Checklist
  - o Customizable Collateral

Climate Protection Campaign

In 2007, The NODC agreed to grant up to 50% of the cost of membership for cities and counties in the area to join ICLEI (International Council for Local Environmental Initiatives) and purchase software required to do a professional baseline inventory of energy use and projections of greenhouse gas emissions in this area. To date, the Council has paid $1,500 in membership support, which has allowed the City of Port Townsend, Jefferson County, Clallam County, and the City of Sequim to become ICLEI members and receive the inventory software.

Using the software, Jefferson County completed its baseline assessment. The Jefferson Climate Action Committee developed an action plan to reduce carbon emissions across many sectors, including county operations, transportation, and green building. Clallam County also conducted a baseline assessment and formulated an action plan to reduce the carbon footprint of County operations. Members involved in the ICLEI baseline activities, along with other community representatives, transit organizations and the NODC formed a two-county group to discuss strategies for implementing action items identified in the carbon reduction plans.

ADD 51

10/04/2019     183127

$******600.00

SIX HUNDRED AND 00/100 DOLLARS ****************************************

ICLEI LOCAL GVT.
1536 WYNKOOP ST #901
DENVER CO 80202

PO# 053770

# ICLEI USA
## Local Governments for Sustainability

1536 Wynkoop Street #901
Denver, CO 80202
202-800-0301
kale.roberts@iclei.org
www.icleiusa.org

**Invoice**

**BILL TO**
Port Angeles, WA
321 East 5th Street
Port Angeles, WA 98362

| INVOICE # | DATE | TOTAL DUE | DUE DATE | ENCLOSED |
|---|---|---|---|---|
| 1592 | 08/30/2019 | $600.00 | 08/31/2019 | |

**MEMBER PERIOD**
09/01/2019 -08/31/2020

| DESCRIPTION | ITEM | AMOUNT |
|---|---|---|
| Annual Membership dues for population 50,000 and under | **Dues - pop. under 50,000** | 600.00 |
| Choose your payment option above or send paper checks to: ICLEI - Local Governments for Sustainability,USA 1536 Wynkoop St. Suite 901 Denver, CO 80202 | BALANCE DUE | **$600.00** |

ADD 52





















**Hawaii County, HI**
United States

| MAYOR | POPULATION | MEMBER SINCE |
|---|---|---|
| Kimo Alameda | 198,449 (2016) | 01.03.2018 |

# ICLEI Members

ICLEI is working with Members around the world



Q Search          ▼ Filters     Sort: Most recent ⌄

**50 of 1200 ICLEI Members**

Mexico, Latin America & Caribbean
**Municipality of Nuevo Laredo**

Germany, Europe
**City of Mainz**

Mexico, Latin America & Caribbean
**Álvaro Obregón Borough Municipality**

Ukraine, Europe
**Mozolevske Village Council**









ADD 63



# ICLEI Members

ICLEI is working with Members around the world

Search    Filters    Sort: Most recent

**50 of 1200 ICLEI Members**

Mexico, Latin America & Caribbean
**Municipality of Nuevo Laredo**

Germany, Europe
**City of Mainz**

ADD 64

# EXHIBIT F



A sample 500 millibar upper air chart. The gradient is the largest where the brown lines are closest together.
Download Image

Worthington's location is red dot.





Meandering around the planet like a rollicking roller coaster in the sky, the Northern Hemisphere's polar jet stream is a fast-moving belt of westerly winds that traverses the lower layers of the atmosphere. The jet is created by the convergence of cold air masses descending from the Arctic and rising warm air from the tropics. Deep troughs and steep ridges emerge as the denser cold air sinks and deflects warm air regions north, giving the jet stream its wavy appearance. This pattern propagates across the mid-latitudes of North America, Europe and Asia, as pockets of cold air sporadically creep down from the Arctic - creating contrasting waves and flows that accelerate eastward due to Earth's rotation. Running from June 10 to July 8 of 1988, the visualization below uses weather and climate observations from NASA's MERRA dataset to model nearly a month of the jet stream's whirling journey over North America.



Polar Jet
This video is also available on our YouTube channel.

ADD 67

Worthington's location black dot.



Polar Jet

This video is also available on our YouTube channel.

# EXHIBIT G

ADD 69

Since 2005, Washington's food economy has seen the total value of its grown commodities nearly **triple**, though the split between exports and local use remains uneven. While the **export value** peaked in 2018, the **local/domestic market value** has continued to rise due to inflation and increased internal demand for premium Washington products like apples and dairy.



Bureau of Labor Statistics (.gov) +1

**Key Data Insights**

- **Total Economic Value:** The total value of Washington-grown food climbed from **$9.0B** in 2005 to an estimated **$20.5B** in 2024.

- **Export Share:** About **35-40%** of the state's agricultural value consistently comes from international exports. However, 2025 projections show a decline to **$6.5B** in exports, primarily due to softening global demand for grains.

- **Local Market Growth:** The value of food staying in the local or domestic U.S. market reached a high of **$12.9B** in 2024, partially driven by a **28% increase** in global food price indices since 2014.

- **Consumption Gap:** Despite the high dollar value, the "physical volume" gap remains high—Washington still imports the vast majority of its leafy greens, with local production meeting less than **10%** of metropolitan demand [Previous Turns].



Statista +2

ADD 70



In Washington, emissions from cargo movement show a widening gap between **local/regional pollution**, and **international shipping emissions,** which track more closely with global trade weight and fuel-intensive air cargo.

Department of Ecology - State of Washington (.gov) +2

**Emissions Trend Analysis (2005–2025)**

- **International Shipping Intensity**: International emissions—driven by **bunker fuel** on trans-Pacific routes and **jet fuel** for air cargo—have proven harder to reduce. While maritime shipping is more efficient per ton, the **55% increase** in air cargo weight since 2009 has kept total international fuel-related emissions high.

OECD statistics blog +6

**Comparing Total Volume vs. Impact**

- **Maritime**: Responsible for approximately **3% of global emissions**.

- **Air Cargo**: While handling significantly less weight than sea cargo, air freight at Sea-Tac Airport is roughly **68 times more carbon-intensive** per ton-kilometer, making it

ADD 71

the primary driver of the state's international shipping carbon footprint [Previous Turns].

OECD statistics blog +2

In Sequim, the "push-through" of emissions from the **Strait of Juan de Fuca** is a significant factor in your local air quality. Because the Strait acts as a 100-mile-long wind tunnel with **prevailing westerly winds**, it effectively funnels the exhaust from over **10,000 annual ship transits** directly toward the Olympic Peninsula.

National Weather Service (.gov) +1

**The "Strait Funnel" Effect**

- **Diverting Emissions**: The high-density shipping lanes between **Vancouver Island** and the Washington coast are used by deep-sea container ships, oil tankers, and bulk carriers. These vessels burn large volumes of fuel, and the prevailing winds push their **sulfur dioxide ()** and **nitrogen oxides (**directly into the Sequim "rain shadow".)

- **Vessel Traffic Growth**: A 2024–2025 projection identified a potential **18% increase** in large commercial vessel traffic in the Salish Sea, primarily driven by Canadian projects like the Trans Mountain Pipeline expansion.

- **Local Stagnation**: While the wind "pushes" the pollution, Sequim's topography can cause it to "pool" against the Olympic foothills, especially during winter inversions [Previous Turns].

Oil Spills 101 (.gov) +4

**Sequim Pollution Exposure: Strait vs. Local Sources**

**Current Regional Data (March 2026)**

- **Wind Direction**: Current marine forecasts for the <u>Central Strait of Juan de Fuca</u> show **WNW (West-Northwest) winds at 16 kt,** which is the classic "push" direction toward the Dungeness Spit and Sequim.

- **Air Quality Status**: Sequim's AQI is currently **Good (15-20),** but is expected to experience roughly **7 to 8 days per year** where the index exceeds 100 due to these combined factors.



National Weather Service (.gov) +3



The charts for the **green (local)** and **red (international)** lines are based on distinct official datasets that track different types of pollution in Washington.

**The Green Line: Local/Regional Emissions**

The primary source for this data is the **Puget Sound Maritime Air Emissions Inventory (PSEI).**

- **The Data:** This inventory is a collaborative effort by seven Washington ports (including Seattle and Tacoma), six government agencies, and three industrial

ADD 73

partners. It has been conducted every five years since 2005 (2005, 2011, 2016, 2021).

### Washington Tonnage Trends (2009–2025)

The following data tracks the physical weight (metric tons) handled by the state's primary gateways: the **Northwest Seaport Alliance (NWSA)** for maritime and **Seattle-Tacoma International (SEA)** for air.

| Year | Waterborne (NWSA) | Air Cargo (SEA Airport) | Trend Analysis |
| --- | --- | --- | --- |
| 2009 | 19,300,000 mt | 275,000 mt | Global Recession Low |
| 2014 | 22,000,000 mt | 327,000 mt | Steady Post-Recession Recovery |
| 2018 | 26,400,000 mt | 432,315 mt | **Maritime Peak** (pre-tariff surge) |
| 2021 | 25,100,000 mt | 498,741 mt | **All-Time Air Record** (Pandemic) |
| 2024 | 24,000,000 mt | 460,062 mt | Normalization of Trade |
| 2025 | 22,600,000 mt | 427,971 mt | Correction from 2025 "Frontloading" |

ADD 74



**Data Provenance**

**The figures above are synthesized from:**

- **Maritime Weight:** NWSA Cargo Statistics **and USACE Waterborne Statistics.**

- **Air Cargo Weight: Port of Seattle Air Cargo Reports.**

- **Pollution Estimates: Calculated based on the Puget Sound Maritime Air Emissions Inventory and federal EPA AirToxScreen emissions intensity factors.**

**Fuel Pollution Trends: Jet Stream & Bunker Fuel**

The pollution index below tracks the divergence between air cargo (high intensity, correlated with the 55% weight increase since 2009) and maritime cargo (increased efficiency due to strict sulfur regulations).

- **Air Cargo (Jet Fuel):** Emissions track closely with tonnage. Jet fuel consumption has risen by approximately **55%** since 2009. While modern engines are more efficient, the sheer volume of weight and the impact of the **jet stream** (requiring more fuel burn on westbound flights) have kept total emissions high.

ADD 75

□    □

# Can Western Washington Feed Itself?

HOME » CAN WESTERN WASHINGTON FEED ITSELF?

**NEWS RELEASES**

**JULY 3, 2012  |  BY RICHARD CONLIN  |**



**The weekly Pike Place Market Express provides access to locally grown food right here at City Hall.** (City Council Photo)

The Local Food Action Initiative (LFAI) is designed to increase gardening and farming in the City, encourage farmers markets and other connections to local producers, and emphasize food as an important part of our economy. We know that eating more locally can reduce the cost of transport, provide access to food that is healthier and produced in a less resource intensive way, support regional farmers and farmland and keep money circulating in the local economy. We also know that we can't grow all of our food within the region — products like bananas and coffee will always have to be imported from farther away.

How much of the food we consume can we actually supply within our region (within our local 'foodshed')? What is a reasonable definition of our foodshed, and will it always supply only a small part of our consumption, or can we actually come closer to balancing local consumption and production, at least for those products that can be grown given our local ecological constraints?

ADD 76

A group of University of Washington graduate students, under the direction of Kara Martin of Urban Foodlink and Professor Brandon Born, has released a "Western Washington Foodshed Study" commissioned by the American Farmland Trust, that seeks to answer these questions. They defined our foodshed as the 19 Washington counties west of the Cascades, an area that includes both urban and rural patterns of settlement, that has a common ecological pattern, and within which local products can be transported relatively easily.

Using data from the USDA's Economic Research Service, the study estimates that the 5.2 million inhabitants of Western Washington consume almost 6 billion pounds of food annually (that breaks down to about 3 pounds per person, per day). A lot of food gets wasted within our food system, though, so much more food – about 8.6 billion pounds – needs to be produced in order for those 6 billion pounds to make it to our forks. Of the top 20 items we consume, 15 can be grown in our ecosystem. And there are numerous other items that we should be eating more of (like leafy green vegetables) that are not in the top 20 but can easily be produced here. Relocalizing our diets could improve our health as well as our local economy.

Production of food in Western Washington totals almost 4 billion pounds, about 43% of the food we need to sustain our current diets. That is actually a pretty substantial production base, but the percentage of specific food items consumed versus produced locally varies widely. Our foodshed produces about 1.5 times as much dairy products as we consume, but only about half of the vegetables we eat and 10% of the fruits and protein products we consume. Of course, drilling down to specific products reveals an even more complex picture, with some food items produced in surplus and exported, and others largely imported. Adjusting for food exports, our 17,000 farms produce about 25% of the food that we consume in Western Washington.

How could we increase this amount and encourage a more healthy diet? The recommendations are clear:

- ☐ Protect the farmland that is currently in production, and bring land currently underutilized into production. Some of the region's best historic farmland is still being lost to development, but much of it is still undeveloped, and could be brought back into agriculture. A targeted strategy to protect prime land will be critical to our food future.

- ☐ Increase food yields on currently active farmland. By using simple technologies like hoop houses, adopting improved farming practices and converting some land currently used for non-food items to edible crop production, we could produce significantly more food than we do now on the farms we already have.

- ☐ Cut down on food waste at all stages of the food production chain. As it stands, about 40% of the food that's produced never makes it to our plates. Innovations in packaging, improved inventory management technologies and consumer education campaigns could go a long way to making our food system more efficient.

- ☐ Shift to healthier diets, in line with USDA guidelines. On average, we currently eat almost 40% more than we should; cutting back even moderately would make it easier to meet our own food needs within the region. The USDA also recommends that we up our consumption of

vegetables and dairy, which we produce readily in Western Washington, and reduce our consumption of protein, sugar and grains, which we don't produce so much of.

- ☐ Continue to encourage and facilitate infrastructure that makes it possible for local farmers to process and store food and connect with local markets. We can also consider the opportunities to produce food that has local markets but is served by imports. For example, we currently produce only 6% of the leafy greens that we consume, yet we can grow them practically year-round. Identifying similar market opportunities and developing a farm to market strategy could make a huge difference in matching local consumption with production.

Forget about the oranges, bananas, and coffee – that is not the issue.  Let's focus on what we're able to grow here, and on what we can do to ensure that our considerable agricultural assets translate into a robust local food system.

This study demonstrates that we do produce a significant amount of the food we consume, and that we can do much more with the right kind of local food strategy.  We can eat a healthier diet, protect our environment, and keep our dollars in the local economy while supporting our farmers, restaurants, and food-related businesses.  If we really want to eat locally, we have to take practical steps to make doing so possible. A coordinated regional food strategy would produce multiple benefits for all of us.  We can do many great things within the City, but this regional work is essential to truly realizing the vision of the Local Food Action Initiative.

**HELPFUL LINKS**

☐ **Meet the Council**

ADD 78

- ☐ Mayor's Office
- ☐ Council Calendar
- ☐ Council Agendas
- ☐ Council Committees
- ☐ Watch Council Live

**MAKE YOUR VOICE HEARD**

**Find Your Council District**
**Contact the Council**
**Sign up for Public Comment**
**Register to Vote**

**COUNCILMEMBERS**

- ☐ **Rob Saka**
- ☐ **Eddie Lin**
- ☐ **Joy Hollingsworth**
- ☐ **Maritza Rivera**
- ☐ **Debora Juarez**
- ☐ **Dan Strauss**
- ☐ **Robert Kettle**
- ☐ **Alexis Mercedes Rinck**
- ☐ **Dionne Foster**

---

The official blog of the Seattle City Council

ADD 79

# EXHIBIT H

ADD 80

Following the 2009 EPA Endangerment Finding, federal regulatory and financial mechanisms were used to leverage Washington state's environmental policies, stationary source permitting, and vehicle markets. Below are exhibits supporting this leveraging activity:

### 1. Federal Regulatory Leverage

- **Vehicle Emission Standards (2012–2027):** The 2009 Finding enabled the EPA and NHTSA to establish the first-ever national greenhouse gas (GHG) emission standards for light-duty vehicles (2012–2016) and subsequent standards through 2027. Washington's Department of Ecology incorporated these federal regulations by reference and adopted California's more stringent standards (RCW 70A.30.010), requiring manufacturers to sell cleaner vehicles in Washington.

- **Stationary Source Permitting (PSD and Title V):** The 2009 Finding required that large stationary sources—such as refineries and industrial facilities in Washington— undergo "Prevention of Significant Deterioration" (PSD) review and obtain Title V permits for greenhouse gases.

- **Clean Power Plan (CPP):** The 2009 finding provided the legal basis for the federal Clean Power Plan, which required Washington and other states to significantly reduce emissions from the power sector, forcing a shift from coal-fired generation to renewables.

 U.S. Energy Information Administration (EIA) (.gov) +4

### 2. State-Level Alignment and Reporting

- **Mandatory GHG Reporting (2010):** Following the federal action, Washington law (RCW 70A.15) mandated that the Department of Ecology begin regular, mandatory tracking and reporting of GHG pollution (initially biennially), aligning state reporting with the federal regulatory framework.

- **Emission Limits Law:** Washington subsequently set statewide legal limits for emission reductions (aiming for 1990 levels by 2020), mirroring the federal push initiated by the 2009 Finding.

 Department of Ecology - State of Washington (.gov) +3

ADD 81

### 3. Leveraging Through Grants (Capacity Building)

- **Climate Pollution Reduction Grants (CPRG):** The federal government provided grants (such as the CPRG, authorized under the Inflation Reduction Act in 2022) to the Washington Department of Commerce and regional agencies for developing comprehensive, federally aligned climate action plans.

- **Air Quality and Overburdened Communities:** Washington state used federal, EPA-backed guidelines to identify and address "overburdened communities," using state initiatives to tackle the public health risks related to air quality that were identified in the 2009 Finding.

 Department of Ecology - State of Washington (.gov) +3

As shown above, following the 2009 EPA Endangerment Finding, federal regulatory and financial mechanisms were used to leverage Washington state's environmental policies, stationary source permitting, and vehicle markets.

The EPA's **Statement of Assurances** functions as a binding contractual mechanism that leverages Washington's state-level infrastructure to ensure compliance with federal **Clean Air Act (CAA)** mandates and the objectives of the **2009 Endangerment Finding**.

By signing these assurances as part of federal assistance agreements—such as the Climate Pollution Reduction Grants (CPRG)—Washington provides formal guarantees that it will align its state laws, reporting, and enforcement with federal climate goals.

 Washington State Department of Commerce (.gov) +1

### 1. Financial Leverage through Conditional Grants

The EPA uses Statements of Assurances to tie federal funding directly to state performance and legal alignment.

- **Capacity Building:** Washington received **$3 million** in Phase 1 planning funds for its Priority Climate Action Plan (PCAP). To receive these funds, the state had to

ADD 82

provide assurances that it would meet specific deliverables, such as updating the state's climate action plan to build upon recent clean energy and climate justice laws.

- **Implementation Eligibility:** Providing these assurances made Washington eligible for much larger competitive grants, such as the **$49.9 million** awarded to King County in July 2024 to reduce building emissions.

 Puget Sound Clean Air Agency (.gov) +2

### 2. Regulatory Alignment and Reporting

Assurances leverage Washington's **Department of Ecology** to serve as a local arm for federal monitoring and reporting.

- **Mandatory Reporting:** Washington's WAC 173-441, which requires facilities emitting over 10,000 metric tons of $CO_2e$[1] to report annually, ensures that state-level data is available to support the EPA's national inventory.

- **SIP Integration:** Through **State Implementation Plans (SIPs)**, the EPA provides "conditional approval" for state regulations (like the Low Emission Vehicle program) if the state commits to specific enforceable measures within a certain timeframe.

Federal Register (.gov) +2

### 3. Legal and Enforcement Coordination

The EPA leverages Washington's legal authority to enforce federal standards at the state level.

- **Strict Liability Enforcement:** Under the CAA, Washington's enforcement policies often mirror the EPA's, where willfulness or negligence can increase penalties for industrial violators.

- **Defending the Finding:** Washington's Attorney General has repeatedly used the legal standing established by these agreements to challenge federal attempts to

---

[1]  CO2e stands for **Carbon Dioxide Equivalent**.

rescind the 2009 Endangerment Finding, arguing that such a move would be catastrophic for the state's public investments and residents.

🏛️Washington State | Office of the Attorney General (.gov) +3

**Summary of Leveraging Mechanisms (2009–2025)**

| Mechanism | Role of Assurances | Impact on Washington |
|---|---|---|
| **Federal Grants** | Guaranteeing plan completion. | Secured **$156M** for residential solar and **$50M** for building retrofits. |
| **SIP Approval** | Binding state to federal targets. | Codified **Clean Fuel Standards** and ZEV requirements into state law. |
| **Reporting Law** | Providing data for federal use. | Mandated state-wide GHG reporting to support national targets. |

he final reference for the **Statement of Assurances** regarding compliance with EPA regulations is typically found in the EPA Form 4700-4 (Preaward Compliance Review Report) and the associated Assistance Agreement.

When Washington agencies like the Department of Ecology or Department of Commerce accept federal funds, they sign these documents as a legal commitment to follow all applicable federal environmental laws and non-discrimination statutes.



Washington State Department of Commerce (.gov) +1

**1. Preaward Compliance (EPA Form 4700-4)**

This form is a mandatory part of the grant application package. By signing it, Washington state applicants certify:

ADD 84

Reginfo.gov

- **Regulatory Alignment**: That their programs and activities are conducted in a nondiscriminatory manner as required by EPA regulations.

- **Enforcement Commitment**: If an applicant is found out of compliance, they must enter a **six-month agreement** to implement necessary changes to meet EPA requirements.

- **Continuous Compliance**: The form must be updated for every new grant or extension, ensuring the state remains tethered to current federal standards.



U.S. Environmental Protection Agency (.gov) +4

**2. The Assistance Agreement**

Once the EPA awards a grant (such as the CPRG), the **Assistance Agreement** serves as the final binding contract.



U.S. Environmental Protection Agency (.gov)

- **Signature of Acceptance**: The state official's signature on this agreement confirms acceptance of all terms and conditions, including adherence to the Quality Management Plan (QMP) and Quality Assurance Project Plans (QAPP).

- **Financial Leverage**: Funds are only released after the official signs this acceptance, effectively leveraging the state's budget to ensure they follow all EPA environmental measurement and data generation standards.

U.S. Environmental Protection Agency (.gov) +1

**3. Impact on Washington State**

ADD 85

In the context of the **2009 Endangerment Finding**, these assurances have forced Washington to:

- **Mirror Federal Standards**: Align state laws (like <u>WAC 173-441</u> for GHG reporting) with federal data requirements to maintain grant eligibility.

- **Secure Implementation Funding**: Providing these assurances allowed Washington to secure a **$49.9 million** grant for building retrofits in King, Kitsap, Pierce, and Snohomish counties in 2024.



U.S. Environmental Protection Agency (.gov) +1

- **Offshoring Trends**: Evidence suggests a "pollution-offshoring" strategy where U.S. firms shift production to countries with less stringent environmental regulations. This shift often restricts manufacturing jobs in the U.S. and favors low-wage import competition.



REMI model +3

ADD 86